# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
June 5, 2007 Session

## STATE OF TENNESSEE v. GARY LEE MARISE

**Direct Appeal from the Circuit Court for Carroll County**
**No. 05CR66     C. Creed McGinley, Judge**

---

**No. W2006-00265-CCA-R3-CD  - Filed July 26, 2007**

---

The defendant, Gary Lee Marise, was convicted by a Carroll County jury of attempt to manufacture methamphetamine, a Class D felony, and was sentenced by the trial court as a Range I, standard offender to four years in the Department of Correction.  He raises essentially three issues on appeal: (1) whether the evidence was sufficient to sustain the conviction; (2) whether the trial court erred in refusing his request for special jury instructions; and (3) whether he was denied a fair trial and the effective assistance of counsel due to the poor acoustics in the temporary courtroom, which prevented some jurors from hearing his trial counsel.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J.C. McLIN, JJ., joined.

Benjamin S. Dempsey, Huntingdon, Tennessee, for the appellant, Gary Lee Marise.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Hansel Jay McCadams, District Attorney General; and Stephen D. Jackson, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

On May 2, 2005, the Carroll County Grand Jury indicted the defendant for attempt to manufacture methamphetamine, possession of anhydrous ammonia, and criminal trespass.  The State's first witness at the defendant's September 19, 2005, trial was Rosemary Taylor, the owner of the property on which the defendant was alleged to have trespassed.  Taylor testified that she lived on Brooks Road in Atwood but also owned property on Clay Farm Road consisting of a house trailer

and a shed located approximately 75 to 100 feet behind the trailer. She stated that her daughter and granddaughter were living in the trailer in February 2005, and that she stopped by the property on her way to work at approximately 4:30 a.m. on February 7, 2005, to leave some items in her daughter's truck.

Taylor testified that as she was pulling into the driveway she noticed a light in the shed, which she found odd because the lights were not on in the trailer. She then saw a man standing near the corner of the trailer. She got out of her vehicle and asked the man what he was doing, but he ran off without saying a word. At that point, she started across the backyard to the shed, stopping en route to pick up a shovel that she found leaning against a tree. When she reached the shed, she looked in the windows and saw two men she recognized inside. Angry at what she saw, she opened the door and ordered the men to get their things and leave. Asked what the men were doing, Taylor replied:

> I saw scales. I saw a big white bowl, maybe, with something in it, and it looked like one had -- they were pouring something. I don't know. I don't know, but when I told them to get their shit up and get out, something white, a sheet or something, that he bundled stuff up in.

Taylor made a positive courtroom identification of the defendant as one of the two men who had been in her shed. She stated that she knew him because they had both lived in McLemoresville, which had very few residents. She said that she recognized the second man on sight as well but was not certain of his name.

Taylor testified that while the men were gathering their things from the shed, she beat with her shovel on a white Jeep Cherokee parked outside, in the process cracking the parking light on the front passenger side of the vehicle. After attempting to rouse her daughter by banging on the door of the trailer, she returned to find the second man gone and the defendant inside the Jeep, which was blocked by her vehicle. She backed her vehicle up to allow the defendant to exit the property and then drove home to telephone the sheriff's department. When Officers Dickson and Taylor met her at the Clay Farm Road property, she showed them the shed and told them what had occurred. Taylor said that she saw the tops of batteries and a bowl containing dingy white powder inside the shed and a bucket outside the shed containing a substance that smelled like ammonia. She stated that none of these items were hers and she had never before seen them on the property.

On cross-examination, Taylor acknowledged that her daughter and the second man in the shed, Brad Barksdale, might have dated, but said it was not until after February 7, 2005. She further acknowledged that she gave a statement to police in which she said that she thought the man who ran from the corner of the trailer was named Michael Johnson. She testified that she saw both Barksdale and Johnson in the kitchen of the trailer on the day before she found the defendant and Barksdale in her shed but denied that Barksdale was living in the trailer at the time.

Sergeant Andy Dickson, who responded to the Clay Farm Road property on the morning of February 7, 2005, testified that he had been employed full-time by the Carroll County Sheriff's Department since 1992 and had extensive training in the field of narcotics, including specialized training by the Drug Enforcement Administration ("DEA") in the recognition of clandestine methamphetamine labs. In addition, he was also employed part-time by Ferguson Harbor, a group that subcontracted with the DEA to clean up methamphetamine labs. Sergeant Dickson estimated that he had been to more than 150 methamphetamine labs and testified that there was no doubt in his mind, based on his training and experience, that a methamphetamine lab had very recently been in operation on the Clay Farm Road property. He stated that he found several items around and in the shed that are regularly used in the manufacture of methamphetamine, including an Igloo cooler containing a small amount of anhydrous ammonia, the remnants of lithium batteries, a funnel, and a tea pitcher and a one-gallon ice cream container containing the residue of crushed Pseudoephedrine tablets used in the manufacturing process.

Sergeant Dickson identified photographs of these various items during his testimony and explained each item's significance. He said that he was able to distinguish the anhydrous ammonia from ordinary household ammonia by its distinctive odor and the fact that it was boiling or "off-gassing," which anhydrous ammonia, unlike household ammonia, will do when exposed to air. He testified that, following his initial inspection, he called Sergeant Meggs, the narcotics officer for the Carroll County Sheriff's Department, to come take over the investigation. On cross-examination, he acknowledged that he did not submit any of the materials to a laboratory for analysis and could not, therefore, state whether the anhydrous ammonia was of the grade proscribed by statute.

Investigator Timothy Meggs testified that he had attended the DEA's methamphetamine lab school and received his methamphetamine lab certification. He said that when he arrived at the Clay Farm Road site on the morning of February 7, 2005, he first spoke with Sergeant Dickson and Ms. Taylor and then looked at the shed, where he saw "soaked, crushed Sudafed pills" in a one-gallon ice cream container, an Igloo cooler containing a small amount of anhydrous ammonia, the remnants of lithium batteries, a funnel, and a tea pitcher with residue around it. After taking photographs, he went to the defendant's home, where he immediately noticed that the front passenger side parking light on the defendant's white Jeep Cherokee was broken. Investigator Meggs testified that he asked the defendant if he had been home all night, and he replied that he had not been anywhere. He said that when he looked more closely at the defendant's vehicle, he noticed a very strong odor of a Pine-Sol type cleanser. In addition, he saw drops of liquid on the vehicle's seats and liquid standing on the vehicle's floor mats.

William "Brad" Barksdale, testifying on the defendant's behalf, said that he and Rosemary Taylor's daughter, Tammy Taylor, were "seeing each other" in February 2005, but got into a fight early on the morning of February 7 that resulted in her "pretty much . . . kicking [him] out of the house." He stated that she telephoned the defendant, a mutual friend, and asked him "to come over there and get [him] out." The defendant arrived as he was loading his possessions from the shed into his car and Rosemary Taylor appeared at the shed a short time later. Barksdale stated that the methamphetamine components in the shed were his and that the defendant had nothing to do with

them. On cross-examination, he acknowledged that he had been convicted of attempt to manufacture drugs in connection with the case and that he had prior convictions for possession and manufacture of drugs.

The defendant testified that Tammy Taylor telephoned him at approximately 4:00 a.m. on February 7, 2005, wanting him to come remove Barksdale from her residence. When he arrived at her home, he found Barksdale loading things from the shed into his car. He said that Rosemary Taylor appeared at the shed a short time later, became hysterical, and broke the parking light on his jeep. The defendant testified that the only thing he had in his hand when Rosemary Taylor came to the shed was his cap. He said he did not smell any ammonia around the shed and did not see any methamphetamine lab components.

Following deliberations, the jury convicted the defendant of attempt to manufacture methamphetamine but acquitted him of the trespassing and possession of anhydrous ammonia counts of the indictment. The defendant was subsequently sentenced as a Range I, standard offender to four years in the Department of Correction. Thereafter, he filed a timely notice of appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant lists eleven separate issues for review in his brief, but condenses eight of these into his argument that the evidence was insufficient to sustain his conviction. Specifically, he argues that the State presented only "three opinion witnesses of circumstantial evidence" to prove his guilt of the offense while he presented two "factual witnesses of direct evidence" to prove his innocence. The State disagrees with the defendant's characterization of the proof and argues, among other things, that it was within the jury's province to disbelieve the defendant's and Barksdale's testimony that the defendant had nothing to do with the methamphetamine components found at the shed. We agree with the State.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction, the State had to prove beyond a reasonable doubt that the defendant knowingly attempted to manufacture methamphetamine, a Schedule II controlled substance. See Tenn. Code Ann. §§ 39-17-408(d)(2), -417(a)(1). "'Manufacture' means the production, preparation, propagation, compounding, conversion or processing of a controlled substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis. . . ." Tenn. Code Ann. § 39-17-402(15). A person commits criminal attempt when that person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). For conduct to be a "substantial step," a person's "entire course of action" must be "corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b).

Contrary to the defendant's assertion, the State presented both direct and circumstantial evidence of his guilt. Rosemary Taylor testified that when she looked in the shed, she saw scales, a bowl, and the defendant and Barksdale in the process of pouring something from one container to another. When she accompanied Sergeant Dickson back to the shed, she noticed a bowl containing a dingy white powder inside the shed, some batteries, and a bucket containing a substance that smelled like ammonia. Sergeant Dickson and Investigator Meggs, both of whom had extensive experience in the recognition of methamphetamine labs, identified these items as remnants of lithium batteries, anhydrous ammonia, and the residue from crushed Pseudoephedrine tablets, all essential components in the manufacture of methamphetamine. Viewed in the light most favorable to the State, this evidence was more than sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant was attempting to manufacture methamphetamine in the shed. Accordingly, we conclude that the evidence was sufficient to sustain the defendant's conviction.

## II. Special Jury Instructions

The defendant next contends that the trial court erred in refusing his request for special jury instructions. Specifically, he argues that the trial court should have instructed the jury that a

defendant's mere presence in a location where drugs are found or association with someone in possession of drugs is not, alone, sufficient to support a finding that the defendant was in possession of the drugs. The State argues that the failure to give the requested jury instructions is irrelevant given the fact that the defendant was not convicted of possession of drugs. The State further argues that the trial court's instructions to the jury were correct. We again agree with the State.

As an initial matter, we note that Rule 30 of the Tennessee Rules of Criminal Procedure provides that requests for special jury instructions be in writing. Although the defendant asserts that he filed a written request for the special jury instructions, no such request is included in the record before this court. It is the defendant's duty to prepare a fair, accurate, and complete record on appeal to enable meaningful appellate review. See Tenn. R. App. P. 24(b). Regardless, the defendant is not entitled to relief on the basis of this issue. Defendants have a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). A trial court's denial of a request for special jury instructions is error only when the trial court's charge does not fully and fairly state the applicable law. State v. Cozart, 54 S.W.3d 242, 245 (Tenn. 2001). The record here reveals that the trial court correctly and completely instructed the jury on the law as it applied to the facts in the case, which included issuing the pattern jury instruction on actual and constructive possession. As such, we conclude that the trial court committed no error in its refusal to give the defendant's requested special instructions.

### III. Poor Acoustics in Courtroom

As his final issue, the defendant contends that the poor acoustics in the temporary courtroom, which prevented the jurors from hearing his trial counsel, denied him of a fair trial and of his Sixth Amendment right to effective assistance of counsel. The State argues that the defendant has waived the issue for failing to include the transcript of the hearing on the motion for a new trial in the record on appeal. The State further argues that the defendant has not met his burden of showing that his trial counsel was ineffective.

The defendant asserts in his brief that the jurors forwarded a note to the judge after the lunch break stating that they had been unable to hear anything that defense counsel said during the morning session of court. However, we can only find two brief references to the jurors' hearing difficulties in the record. The first occurred at the beginning of defense counsel's cross-examination of Rosemary Taylor when the trial court instructed him to "[s]peak up, please," telling him that the court had noticed that the jurors were straining to hear him. At that point, defense counsel requested and received permission to move closer to the jurors. The second reference occurred in the following brief exchange held immediately prior to closing arguments:

> THE COURT: The jurors have indicated they're having problems hearing, so I believe if you've got anything to say, you probably need to say it loud enough that they can hear you, okay? And I'm not adverse to you using the mike if you wish.

[DEFENSE COUNSEL]: I'm going to stand right up there to the fence rail, to the bar, and speak to them. Is that all right with you, General, if I stand there?

THE COURT: The[n] [the court reporter] can't hear you.

[DEFENSE COUNSEL]: All right. Could I use the microphone?

THE COURT: Yes. If one of you uses the mike, probably both of you should rather than it appear that you're making emphasis.

Neither the note the jurors forwarded to the trial court nor the transcript of the hearing on the motion for a new trial is included in the record on appeal. Thus, we have no way of knowing the extent or severity of the jurors' hearing difficulties. As previously noted, it is the defendant's duty to prepare a fair, accurate, and complete record on appeal, see Tenn. R. App. P. 24(b), and when necessary parts of the record are not included, we must presume that the trial court's ruling was correct. See State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991). We also note that the defendant made no motion for a mistrial, which suggests to us that the jurors may have merely expressed that they were having some problems hearing and not, as the defendant now asserts, that they had been unable to hear anything said by defense counsel during the morning session. We conclude, therefore, that the record does not support the defendant's claim that his right to a fair trial was violated by the poor courtroom acoustics.

The defendant also argues that the poor courtroom acoustics and his counsel's inability to make himself heard resulted in the ineffective assistance of counsel. As the State points out, this court has repeatedly cautioned that raising an issue of ineffective assistance of counsel on appeal is a practice to be avoided, due to the difficulty in proving an ineffective assistance of counsel claim without an evidentiary hearing and the danger that the defendant will not only lose on direct appeal, but also be barred from raising the issue in a later post-conviction petition. See Kendricks v. State, 13 S.W.3d 401, 405 (Tenn. Crim. App. 1999); Thompson v. State, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997). However, although the defendant raises his claim of ineffective assistance of counsel on appeal, he did not include the issue in his motion for a new trial. Thus, we conclude that this issue is waived. See Tenn. R. App. P. 3(e); State v. Alvarado, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996).

## **CONCLUSION**

Based on our review, we conclude that the evidence was sufficient to sustain the defendant's conviction. We further conclude that the trial court did not err in denying the defendant's request for special jury instructions and that the defendant's right to a fair trial was not violated by the poor courtroom acoustics. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE